TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00640-CV






Appellant, TGS-NOPEC Geophysical Company// Cross-Appellants, Susan Combs,
Successor-in-Interest to Carole Keeton Strayhorn, Comptroller of Public Accounts

of the State of Texas, and Greg Abbott, Attorney General of the State of Texas


v.


Appellees, Susan Combs, Successor-in-Interest to Carole Keeton Strayhorn, Comptroller

of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the

State of Texas// Cross-Appellee, TGS-NOPEC Geophysical Company






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. D-1-GN-05-000637, HONORABLE GISELA D. TRIANA, JUDGE PRESIDING




O P I N I O N



 This appeal arises from a franchise tax dispute involving the apportionment of
gross receipts from the licensing of geophysical and seismic data. The parties filed cross-motions
for summary judgment, and the trial court granted summary judgment in favor of the Comptroller (1)
on the issue of tax liability but, finding that the Comptroller abused her discretion in denying
appellant TGS-NOPEC Geophysical Company's requests to waive penalties and interest, the
trial court granted summary judgment to TGS on that issue. TGS appeals the trial court's summary
judgment of tax liability, and the Comptroller cross-appeals from the trial court's summary judgment
reversing the imposition of penalties and interest. Because we find no error, we affirm the trial
court's judgment.


BACKGROUND


 TGS licenses geophysical and seismic data to its customers throughout the
United States and abroad. This data is used by oil and gas companies to explore for and develop oil
and gas deposits and can be licensed to more than one customer. TGS charges each customer a flat
fee for a non-exclusive license to use the data. (2) The data is typically provided to customers on
magnetic tape. Once the data is delivered to the customer, the customer uses the data at its discretion
with limited restrictions on transferability and who can view the data.

 The State of Texas imposes franchise taxes on each business, or taxable entity, that
does business in this state. See Tex. Tax Code Ann. § 171.001 (West 2008). Franchise taxes
are imposed annually based on business done in Texas during the previous accounting year. Id.
§ 171.1532 (West 2008). Subject to various exceptions and exemptions, the franchise tax rate
for most businesses is one percent of that business's taxable margin. (3) Id. § 171.002 (West 2008).

Section 171.101 of the tax code describes the calculation used to determine taxable margin. Id.
§ 171.101 (West 2008). To determine the amount of franchise tax owed, a business's taxable margin
must be apportioned between business done in Texas and business done elsewhere. Id. § 171.106
(West 2008). This calculation is done by multiplying a business's taxable margin by a fraction,
the numerator of which is the business's gross receipts from business done in Texas, and the
denominator of which is the business's gross receipts from all of its business. Id. §§ 171.103
(determining gross receipts for business done in Texas); .105 (determining gross receipts for entire
business); .106(a) (apportioning taxable margin) (West 2008).

 This appeal concerns a dispute about the numerator, or TGS's gross receipts for
business done in Texas. The tax code currently requires TGS to pay franchise taxes based on its
gross receipts for its licensing activities in Texas. See id. §§ 171.002, .103(a)(4). Prior to 1997, the
tax code did not specify how to apportion gross receipts from licensing activities for franchise tax
purposes. See Act of Aug. 13, 1991, 72nd Leg., 1st C.S., ch. 5, § 8.06, 1991 Tex. Gen. Laws 134,
156 (codified as amended at Tex. Tax Code Ann. § 171.103(4)); Act of May 27, 1993, 73rd Leg.,
R.S., ch. 546, § 3, 1993 Tex. Gen. Laws 2043, 2043 (codified as amended at Tex. Tax Code Ann.
§ 171.1032(a)(4)). TGS therefore relied on opinions and letter rulings issued by the Comptroller to
apportion its gross receipts and calculate the amount of franchise taxes owed. Prior to 1997, for
franchise tax purposes, the Comptroller treated the licensing of geophysical and seismic data as
"sales of an intangible" and apportioned gross receipts from licensing activities based on the location
of the payor. See Tex. Comptroller of Pub. Accounts, STAR Document Nos. 9103L1087B07
(issued Mar. 8, 1991), available at http://aixtcp.cpa.state.tx.us/opendocs/open07/1087b07l.html;
9005L1019F09 (issued May 23, 1990), available at http://aixtcp.cpa.state.tx.us/opendocs/open07/
1019f09l.html; 8209T0476C03 (issued Sept. 10, 1982), available at http://aixtcp.cpa.state.tx.us/
opendocs/open28/0476c03t.html. (4) Finding that patents, copyrights, trademarks, licenses and
franchises were "types of similar intangible assets," the legislature amended the tax code, effective
January 1, 1998, to tax trademarks, franchises, and licenses in the same manner as patents and
copyrights. See Act of May 30, 1997, 75th Leg., R.S., ch. 1185, §§ 5-6, 1997 Tex. Gen. Laws, 4569,
4569-70 (effective Jan. 1, 1998) (originally codified at Tex. Tax Code Ann. §§ 171.103(4),
.1032(a)(4)). (5) The fiscal note estimate prepared by the Comptroller for the 1997 amendments
provided in relevant part:


 Current franchise tax law sources the receipts from trademarks, franchises, and
licenses used in Texas to the state of legal domicile of the corporation remitting the
payments. [Receipts from p]atents and copyrights are [apportioned] to Texas if the
patent or copyright [is] used in Texas. This bill would equalize treatment among
these types of similar intangible assets: The receipts would be [apportioned] to
Texas if the assets were used in Texas. . . . The changes related to sourcing receipts
from certain intangible assets would provide a small revenue gain.


Comptroller of Pub. Accounts, Fiscal Note Estimate, Tex. S.B. 861, 75th Leg., R.S. (1997)
(emphasis added). As a result of the 1997 amendments, taxpayers like TGS were required to
apportion gross receipts from licensing activities based on the location of use instead of the location
of the payor. See Tex. Tax Code Ann. § 171.103(4).

 The Comptroller audited TGS and assessed additional franchise taxes, penalties,
and interest of approximately $1.8 million for the 1997-2000 and 2001-2003 audit periods. These
assessments arose from TGS's failure to correctly apportion its gross receipts as required under the
1997 amendments to sections 171.103 and 171.1032 of the tax code. On December 6, 2004, the
Comptroller issued an amended notice of audit results for the 1997-2000 audit period finding that
TGS owed additional franchise taxes in the amount of $232,437.46, plus interest of $78,489.33. The
Comptroller issued a notice of audit results for the 2001-2003 audit period on December 7, 2004,
finding that TGS owed additional franchise taxes in the amount of $1,162,310.65, plus penalties of
$116,231.07 and interest of $139,021.20.

 After evaluating the factors listed in Comptroller administrative rule 3.5, the
Comptroller waived the penalty for the first audit period but denied waiver of the penalty for the
second audit period. See 34 Tex. Admin. Code § 3.5 (2008). The Comptroller also denied TGS's
request to waive interest for both audit periods. TGS paid the additional taxes, penalties, and interest
under protest and filed suit to recover a refund as permitted under section 112.052 of the tax code. 
See Tex. Tax Code Ann. § 112.052 (West 2008).

 TGS and the Comptroller filed cross-motions for summary judgment. The trial court
granted summary judgment in favor of the Comptroller on the tax liability issue and concluded that
TGS's tax liability for the two audit periods in question was $1,394,748.11. The trial court denied
the Comptroller's motion for summary judgment on the issue of penalties and interest and granted
summary judgment in favor of TGS concluding that TGS should be awarded a refund of all penalties 
and interest assessed and paid for both audit periods in the amount of $339,579.03, plus interest
from the date paid. (6) On appeal, TGS challenges the trial court's summary judgment in favor of the
Comptroller on the issue of tax liability, and the Comptroller challenges the trial court's summary
judgment in favor of TGS on the issue of penalties and interest.


ANALYSIS


 In three issues, TGS complains that the trial court erred in determining TGS was
liable for additional franchise taxes. First, TGS argues that the trial court incorrectly determined
that former sections 171.103(4) and 171.1032(4) applied to the gross receipts generated by TGS
from its licensing activities. Second, TGS argues that the trial court erred in its conclusion that the
Comptroller was uniformly assessing and collecting franchise taxes and, therefore, was not in
violation of the United States and Texas Constitutions. Finally, TGS argues that the trial court erred
in affirming the Comptroller's use of TGS's customers' shipping or billing address as the location
of license use. The Comptroller counters that the trial court correctly applied the relevant statutory
provisions to determine that TGS was liable for additional franchise taxes; the trial court correctly
concluded that the Comptroller did not violate the United States or Texas Constitution; and, based
on the evidence in the record, the trial court correctly affirmed the Comptroller's use of shipping or
billing address as the location of license use. On cross-appeal, however, the Comptroller asserts
that the trial court erred in its conclusion that the Comptroller abused her discretion in imposing
penalties and interest against TGS. For the reasons set forth below, we find no error in the
trial court's judgment.


Standard of Review

 We review the trial court's decision to grant summary judgment de novo. Natividad
v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994). The standards for reviewing a traditional
summary judgment are well established: the movant must show there is no genuine issue of material
fact and that it is entitled to judgment as a matter of law; in determining whether there is a disputed
material fact issue precluding summary judgment, the reviewing court must accept all evidence in
favor of the nonmovant as true; and the court must indulge every reasonable inference in favor of the
nonmovant and resolve any doubts in the nonmovant's favor. See Cathey v. Booth, 900 S.W.2d 339,
341 (Tex. 1995); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). A plaintiff
must establish all elements of the cause of action as a matter of law. Tex. R. Civ. P. 166a(c); City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979). A defendant, however, must
disprove at least one essential element of each of the plaintiff's theories of recovery or conclusively
establish each element of an affirmative defense to prevail. See Friendswood Dev. Co. v. McDade
+ Co., 926 S.W.2d 280, 282 (Tex. 1996).

 As a general rule, a party may not appeal the denial of a motion for summary
judgment because it is an interlocutory order and, therefore, is not appealable. See Cincinnati Life
Ins. Co. v. Cates, 927 S.W.2d 623, 625 (Tex. 1996). However, when both parties move for summary
judgment and the district court grants one motion and denies the other, the unsuccessful party
may appeal both the grant of the prevailing party's motion and the denial of its own. See Holmes
v. Morales, 924 S.W.2d 920, 922 (Tex. 1996). In these circumstances, we review the summary
judgment evidence presented by both sides, determine all questions presented, and render the 
judgment the trial court should have rendered. See FM Props. Operating Co. v. City of Austin,
22 S.W.3d 868, 872 (Tex. 2000); Commissioners Court v. Agan, 940 S.W.2d 77, 81 (Tex. 1997). 
Where the district court does not state the basis for granting summary judgment, the appellant
must negate all grounds that support the judgment. See State Farm Fire & Cas. Co. v. S.S. & G.W.,
858 S.W.2d 374, 381 (Tex. 1993); Carr v. Brasher, 776 S.W.2d 567, 569 (Tex. 1989). If the
appellant fails to negate each ground on which the judgment may have been rendered, we must
uphold the summary judgment. See Carr, 776 S.W.2d at 569.


TGS's Tax Liability

 In its first issue, TGS challenges the trial court's interpretation and application of
former sections 171.103(4) and 171.1032(a)(4). TGS argues that its business activities include
sales of intangible assets and that it derives no benefit from the "use of its licenses." Therefore, for
purposes of calculating its franchise tax liability, TGS argues that it is not subject to sections
171.103(4) and 171.1032(a)(4) as they existed at the time. We disagree.

 As a preliminary matter, sections 171.103(4) and 171.1032(a)(4) were amended
in 1997 during the first audit period. Prior to the 1997 amendments, these statutes provided, in
relevant part:


 Section 171.103. Determination of Gross Receipts from Business Done in this
State for Taxable Capital.


 In apportioning taxable capital, the gross receipts of a corporation from its business
done in this state is the sum of the corporation's receipts from . . . (4) each royalty for
the use of a patent or copyright in this state . . . .



See Act of Aug. 13, 1991, 72nd Leg., 1st C.S., ch. 5, § 8.06, 1991 Tex. Gen. Laws 134, 156 (current
version at Tex. Tax Code Ann. § 171.103).


 Section 171.1032. Determination of Gross Receipts from Business Done in this
State for Taxable Earned Surplus.


 (a) Except for the gross receipts of a corporation that are subject to the
provisions of Section 171.1061, in apportioning taxable earned surplus, the
gross receipts of a corporation from its business done in this state is the sum
of the corporation's receipts from . . . (4) each royalty for the use of a patent
or copyright in this state . . . .



See Act of May 27, 1993, 73rd Leg., R.S., ch. 546, § 3, 1993 Tex. Gen. Laws 2043, 2043 (since
amended and consolidated with Tex. Tax. Code Ann. § 171.103). Thus, prior to 1997, these statutes
did not expressly provide for the apportionment of gross receipts from licenses or licensing activities. 
In light of this omission, TGS relied on opinions from the Comptroller, which treated TGS's
licensing activities as the sale of an intangible and apportioned gross receipts from such activities
based on the location of the payor. See Tex. Comptroller of Pub. Accounts, STAR Document
Nos. 9103L1087B07 (issued Mar. 8, 1991); 9005L1019F09 (issued May 23, 1990); 8209T0476C03
(issued Sept. 10, 1982).

 At the Comptroller's request, the legislature amended the statutes, effective January 1,
1998, to provide for the apportionment of gross receipts from licenses based on the location of use. 
These amendments provided in relevant part:


 Section 171.103. Determination of Gross Receipts from Business Done in this
State for Taxable Capital.


 In apportioning taxable capital, the gross receipts of a corporation from its business
done in this state is the sum of the corporation's receipts from . . . (4) the use of a
patent, copyright, trademark, franchise, or license in this state . . . .



See Act of May 30, 1997, 75th Leg., ch. 1185, § 5, 1997 Tex. Gen. Laws 4569, 4569-70 (current
version at Tex. Tax Code Ann. § 171.103) (emphasis added) ("former § 171.103(4)").


 Section 171.1032. Determination of Gross Receipts from Business Done in this
State for Taxable Earned Surplus.


 (a) Except for the gross receipts of a corporation that are subject to the
provisions of Section 171.1061, in apportioning taxable earned surplus, the
gross receipts of a corporation from its business done in this state is the sum
of the corporation's receipts from . . . (4) the use of a patent, copyright,
trademark, franchise, or license in this state . . . .



See id., § 6, 1997 Tex. Gen. Laws 4569, 4570 (since amended and consolidated with Tex. Tax. Code
Ann. § 171.103) (emphasis added) ("former § 171.1032(a)(4)"). Thus, the amendments expressly
provided for apportionment of gross receipts from licenses based on the location of use.

 TGS argues that the trial court erred in applying the 1997 amendments to TGS's
licensing activities. The crux of TGS's argument is that TGS derives no benefit from its customers'
use of the seismic data provided by TGS; therefore, TGS derives no benefit from the use of a license. 
TGS's argument misses the mark. The evidence showed that TGS and its customers enter
into a contract entitled "Master License Agreement," which allows the customer to use, or license,
TGS's proprietary seismic data. This agreement is non-exclusive in that TGS may license the same
data to multiple customers. Under the terms of the agreement, TGS's customers are designated
as "licensees," and each customer pays a flat fee to TGS for the privilege of using TGS's proprietary
seismic data.

 The question whether TGS's activities fall within the meaning of former
§§ 171.103(4) and 171.1032(a)(4) presents a matter of statutory construction. Our primary goal
when construing a statute is to determine and give effect to the legislature's intent. See City of
San Antonio v. City of Boerne, 111 S.W.3d 22, 25 (Tex. 2003). We begin with the plain language
of the statute at issue and apply its common meaning. Id. Where the statutory text is unambiguous,
we adopt a construction supported by the statute's plain language, unless that construction would
lead to an absurd result. Fleming Foods of Tex., Inc. v. Rylander, 6 S.W.3d 278, 284 (Tex. 1999).

 Based on the plain language of former §§ 171.103(4) and 171.1032(a)(4) and
the evidence in the record, we conclude that the payments received by TGS for licensing
its customers to use proprietary seismic data are gross receipts from the use of a license. See Former
§§ 171.103(4), .1032(a)(4). We reject TGS's argument that its customers, or licensees, are the
intended taxpayers under former §§ 171.103(4) and 171.1032(a)(4). The gross receipts earned by
TGS are derived from TGS's use of a license within the meaning of the statutes. In contrast, TGS's
customers earn gross receipts from the use of TGS's data through the subsequent provision of
exploration or production services or the sale of tangible or intangible personal property--e.g.,
oil, gas, or other geothermal resources. The customers' gross receipts do not arise from the use of
a license. Accordingly, we find no error in the trial court's judgment concluding that former
§§ 171.103(4) and 171.1032(a)(4) applied to the gross receipts generated from TGS's licensing
activities. We overrule TGS's first issue.


Constitutional Claims

 1. Uniform Assessment

 In its second issue, TGS argues that the trial court erred in its conclusion that
the Comptroller was uniformly assessing and collecting franchise taxes. TGS contends that the
Comptroller has violated equal protection by assessing non-uniform franchise taxes against similarly
situated taxpayers. In support of this claim, TGS complains that the Comptroller apportions gross
receipts from the sales and licensing of computer programs based on location of the payor and
that because TGS's licensing of its proprietary seismic data is similar to the transfer of a computer
program, the Comptroller should likewise apportion TGS's gross receipts based on location of
the payor.

 The United States Constitution requires equal protection of the law. See U.S. Const.
amend. XIV, § 1. The requirements for equal protection under the United States Constitution and
equal and uniform taxation under the Texas Constitution are substantially the same. See Railroad
Comm'n v. Channel Indus. Gas Co., 775 S.W.2d 503, 507 (Tex. App.--Austin 1989, writ denied). 
The Texas Constitution's mandate that all taxes be equal and uniform requires that all persons
falling within the same class be taxed alike. See Sharp v. Caterpillar, Inc., 932 S.W.2d 230, 240
(Tex. App.--Austin 1996, writ denied). We begin with the presumption that tax statutes, like other
statutes, are constitutional, and the party challenging the constitutionality of a statute bears
the burden of demonstrating that it fails to satisfy constitutional requirements. See Enron Corp.
v. Spring Indep. Sch. Dist., 922 S.W.2d 931, 934 (Tex. 1996); Vinson v. Burgess, 773 S.W.2d 263,
266 (Tex. 1989). The presumption of constitutionality is especially strong with tax statutes. Vinson,
773 S.W.2d at 266. Like other economic measures that do not involve a fundamental right or
interest, tax statutes are subject to a rational basis standard of equal protection and due process
review. See Rylander v. B & A Mktg. Co., 997 S.W.2d 326, 333 (Tex. App.--Austin 1999, no pet.)
(citing City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976); Williamson v. Lee Optical, 348 U.S.
483, 491 (1955)). In other words, the statute will be upheld against an alleged violation of
equal protection or due process so long as it bears a rational relationship to a legitimate state interest. 
See id. Tax classifications are likewise subject to rational basis review. See Caterpillar, Inc.,
932 S.W.2d at 240; see also B & A Mktg. Co., 997 S.W.2d at 333.

 The legislature has given the Comptroller broad discretion to adopt rules for the
collection of taxes and other revenues so long as the Comptroller's rules do not conflict with
the laws of this state or the constitution of this state or the United States. See Tex. Tax. Code Ann.
§ 111.002(a) (West 2008). Franchise tax rules 3.549 and 3.557 classify revenues from licenses
and software sales into different categories. See 34 Tex. Admin. Code §§ 3.549(e)(7), (30)(A)
.557(e)(6), (25)(A) (2008). (7) Rule 3.549(e)(30)(A) provides that gross receipts from licenses are
apportioned based on the location of use:

 (iii) . . . For reports that are originally due on or after January 1, 1998, revenue
that the owner of a trademark, franchise, or license receives is included in
Texas receipts to the extent the trademark, franchise, or license is used in
Texas. Paragraph (7) of this subsection controls the treatment of receipts
from the sale/licensing of computer programs.


34 Tex. Admin. Code § 3.549(e)(30)(A). In contrast, "[p]aragraph (7) of this subsection" provides
that gross receipts from the sales of computer programs are apportioned based on the location of
the payor:


 (7) Computer services and programs. . . . Receipts from the sale of a computer
program (as the term "computer program" is defined in § 3.308 of this title (relating
to Computers--Hardware, Software, Services and Sales)) are receipts from the sale
of an intangible asset and are apportioned to the legal domicile of the payor.


Id. § 3.549(e)(7). The Comptroller's rules thus establish different apportionment methods for gross
receipts from the sales of computer programs and gross receipts received by an owner of a
trademark, franchise, or license. Cf. 34 Tex. Admin. Code § 3.549(e)(7) with id. § 3.549(30)(A)(iii).

 TGS contends that the Comptroller has violated equal protection because she
apportions receipts from TGS's licensing activities differently than receipts from the licensing
activities of computer software companies. The crux of TGS's argument is that TGS is taxed
differently than computer software companies, not other geophysical data companies. This Court
has previously recognized that a difference in industry products, operations, or business organization
will justify a difference in tax classification, so long as all persons within the same class are taxed
similarly. See Caterpillar, Inc., 932 S.W.2d at 241 (finding no equal protection violation where
similar groups of taxpayers were taxed similarly). Moreover, the United States Supreme Court has
consistently held that "[i]n structuring internal taxation schemes the States have large leeway in
making classifications and drawing lines which in their judgment produce reasonable systems of
taxation." Nordlinger v. Hahn, 505 U.S. 1, 11 (1992) (quoting Williams v. Vermont, 472 U.S. 14,
22 (1985)) (internal quotation omitted); Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356,
359 (1973); see also Regan v. Taxation with Representation of Washington, 461 U.S. 540, 547
(1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax
statutes."); Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 509 (1937) ("This Court has
repeatedly held that inequalities which result from a singling out of one particular class for taxation
or exemption, infringe no constitutional limitation.").

 TGS has provided no proof that it was taxed differently than other geophysical
data companies. The Comptroller asserts that the franchise tax rules meet constitutional standards
because they are rationally related to a legitimate state purpose. Specifically, the Comptroller asserts
that software companies and geophysical data companies "make different products, have different
customers, and operate differently." The Comptroller argues that establishing a rule that apportions
receipts of geophysical data companies differently than receipts of computer software companies
has a legitimate state purpose. Unlike TGS, a software company does not necessarily negotiate
and sign individual license agreements with each of its customers. The Comptroller thus suggests
"administrative convenience" as one reason for its different rules of apportionment because it would
be impractical for software companies to determine "where millions of off-the-shelf computer
programs (including games) were being used."


 In Carmichael v. Southern Coal & Coke Company, the Supreme Court explained, 


 A legislature is not bound to tax every member of a class or none. It may make
distinctions of degree having a rational basis, and when subjected to judicial scrutiny
they must be presumed to rest on that basis if there is any conceivable state of facts
which would support it.


301 U.S. at 509. The Supreme Court confirmed that "administrative convenience" is sufficient
justification for the difference in treatment for different classes of taxpayers. Id. at 511. TGS has
failed to show that its licensing activities are similar to those of computer software companies. For
this reason, we reject TGS's claim that the Comptroller violated equal protection or due process by
establishing a rule that treats computer software companies differently than geophysical data
companies. We overrule TGS's second issue.


 2. Fair Apportionment

 In its third issue, TGS argues that the trial court erred in affirming the Comptroller's
decision to use shipping or billing address as the location of use to calculate TGS's franchise taxes. 
As we understand TGS's argument, TGS contends that, by using TGS's customers' shipping or
billing address to determine the location of use, the Comptroller has unfairly apportioned a larger
share of TGS's gross receipts to Texas and has thereby subjected TGS to higher franchise taxes in
violation of the Commerce Clause.

 The United States Supreme Court has established a four-part test to review the
validity of a state tax under the Commerce Clause. See Complete Auto Transit v. Brady, 430 U.S.
274, 278-79, 288 (1977). To satisfy this test: (1) the taxing state must have a sufficient nexus, or
contact with the taxed activity or entity; (2) the tax must be fairly apportioned; (3) the tax must be
fairly related to the benefits, opportunities, and protection conferred by the taxing state; and (4) the
tax must not discriminate against interstate commerce. See id. TGS contests only whether the
Comptroller has fairly apportioned TGS's gross receipts to Texas. Therefore, we consider only that
aspect of the four-part test.

 The purpose of fair apportionment "is to ensure that each State taxes only its
fair share of an interstate transaction." Goldberg v. Sweet, 488 U.S. 252, 262 (1995); see also
Container Corp. v. Franchise Tax Bd., 463 U.S. 159, 166 (1983). To be fairly apportioned a tax
must be both internally and externally consistent. See Container Corp., 463 U.S. at 169. To be
internally consistent, a tax must be structured in a way that, if every state imposed an identical tax,
no multiple taxation would result. Goldberg, 488 U.S. at 261. The Texas apportionment formula
is internally consistent because it employs a location of use rule. See generally Tex. Tax Code Ann.
§ 171.103(4); 34 Tex. Admin. Code § 5.349(e)(30)(A)(iii). Under this rule, TGS's licensing
activities are apportioned to Texas if the license is used in Texas. If this rule was adopted by all
states, the formula would allocate the gross receipts from each of TGS's licenses in the numerator
of the apportionment factor based on the location of use, and no sale would be included in the
numerator for more than one state. See Goldberg, 488 U.S. at 264; see also Hoffman-LaRoche, Inc.
v. Franchise Tax Bd., 161 Cal. Rptr. 838, 841 (Cal. Ct. App. 1980). Because no more than 100%
of TGS's gross receipts would be taxed by all states, there is no risk of multiple taxation. 
Accordingly, we conclude that the Texas apportionment formula is internally consistent.

 In addition to being internally consistent, the Commerce Clause also requires
apportionment formulas to be externally consistent--i.e., there must be a reasonable relationship
between the tax base apportioned to a state and the intrastate values of the taxpayer's business. See
Amerada Hess Corp. v. Director, Div. of Taxation, 490 U.S. 66, 75 (1989). As the Supreme Court
has explained, "[I]n order to show unfair apportionment, a taxpayer 'must demonstrate that there is
no rational relationship between the income attributed to the State and the intrastate values of
the enterprise.'" Id. (quoting Container Corp., 463 U.S. at 180). The evidence shows that TGS's
Texas customers use the licenses purchased from TGS in Texas. Because Texas affords protections
and benefits to TGS for the use of its licenses in Texas, the state may fairly tax the gross receipts
derived from TGS's licensing activities in Texas. See id. We conclude that the Texas apportionment
formula is externally consistent.

 To the extent TGS challenges the Comptroller's use of TGS's customers' shipping
or billing address to determine the location of use, we find no merit in TGS's argument. The tax
code directs the Comptroller to "determine the amount of tax to be paid from information contained
in the [tax] report or any other information available to the Comptroller." Tex. Tax Code Ann.
§ 111.008 (West 2008) (emphasis added). The record shows that the Comptroller apportioned
TGS's gross receipts based on location of use within the meaning of the relevant statutes. See
Former §§ 171.103(4), .1032(a)(4). The only evidence TGS provided to the Comptroller regarding
location of use included summary reports identifying TGS's customers' shipping or billing
addresses. In the absence of other evidence, we conclude that the Comptroller's use of TGS's
customers' shipping or billing address to determine location of use was reasonable. See generally
Bullock v. Hewlett-Packard Co., 628 S.W.2d 754, 756 (Tex. 1982) (upholding comptroller rule
based on administrative convenience and efficiency); Graves v. Morales, 923 S.W.2d 754, 757
(Tex. App.--Austin 1996, writ denied) (same). 

 TGS contends alternatively that the Comptroller should have used the location where
the geophysical data was shot because that would be a better indicator of location of use within the
meaning of the tax code and TGS could more easily identify that location from its records. TGS
argues that use of the location where the geophysical data was shot would have apportioned fewer
receipts to Texas, thereby resulting in lower franchise taxes for TGS. That the Comptroller could
have used another means to determine location of use within the meaning of the tax code does not
make the method chosen by the Comptroller unreasonable. See Railroad Comm'n v. Mackhank
Petroleum Co., 190 S.W.2d 802, 804 (Tex. 1945) ("This Court cannot strike down an administrative
order on the ground that . . . a more equitable one could be entered."); Railroad Comm'n v. Humble
Oil & Refining Co., 193 S.W.2d 824, 833 (Tex. Civ. App.--Austin 1946, writ ref'd n.r.e.) (agency
has discretion when choosing method to carry out legislative mandate). The Texas Supreme Court
has long recognized that administrative agencies are created to centralize expertise in certain
regulatory areas and, thus, courts should give agencies "a large degree of latitude . . . in the methods
by which [an agency] accomplishes its regulatory function." Corpus Christi v. Public Util. Comm'n,
572 S.W.2d 290, 297 (Tex. 1978) (citing Railroad Comm'n v. Houston Natural Gas Corp.,
289 S.W.2d 559 (Tex. 1956)). The legislature has charged the Comptroller to collect the taxes
imposed by the tax code. See Tex. Tax Code Ann. §§ 111.001 (comptroller shall collect taxes),
171.154 (franchise taxes shall be paid to comptroller) (West 2008). TGS provided no evidence
regarding its proposed method of determining location of use. On this record, we cannot fault the
Comptroller for using the shipping or billing addresses of TGS's customers to determine location
of use. We overrule TGS's third issue. (8)


Penalties and Interest

 On cross-appeal, the Comptroller challenges the district court's judgment finding that
the Comptroller abused her discretion in refusing to waive penalties for the second audit period and
interest for both audit periods. We review the Comptroller's decision to waive penalties or interest
for an abuse of discretion. See Upjohn Co. v. Rylander, 38 S.W.3d 600, 611 (Tex. App.--Austin
2000, pet. denied). On the facts of this case, we agree with the district court that the Comptroller
abused her discretion in refusing to waive penalties for the second audit period and penalties and
interest for both audit periods.

 The Comptroller's authority to waive penalties or interest is governed by section
111.103 of the tax code and section 3.5 of the Comptroller's rules. See Tex. Tax Code Ann.
§ 111.103 (West 2008); 34 Tex. Admin. Code § 3.5. (9) Section 111.103 allows the Comptroller to
settle claims for penalties or interest if the taxpayer exercised reasonable diligence to comply
with the provisions of the tax code. Tex. Tax Code Ann. § 111.103. Rule 3.5 of the Comptroller's
rules specifies the procedures for requesting a waiver of penalties or interest as well as the factors
to be considered by the Comptroller when determining whether to grant a waiver request. See
34 Tex. Admin. Code § 3.5. Since its adoption in 1992, Rule 3.5 has specified different procedures
for requesting a waiver of penalties or interest (and different factors to be considered) depending on
whether the request for waiver was made in connection with an audit or not. See 17 Tex. Reg. 98
(1992), adopted 17 Tex. Reg. 1546 (1992) (codified at 34 Tex. Admin. Code § 3.5). With regard
to a waiver request on an audit liability, the rule in effect at the time of TGS's audit provided that
"penalty or interest . . . may be waived if the taxpayer exercised reasonable diligence to comply with
the tax laws of this state." See 34 Tex. Admin. Code § 3.5(a)(1). Subsection (a)(2) of Rule 3.5
delegates the initial authority to waive penalty and interest to the audit manager, but subsection (a)(4)
allows a taxpayer to raise the issue as a contested case matter in a refund or redetermination hearing. 
Id. § 3.5(a)(2), (4). When reviewing a penalty waiver request, Rule 3.5 requires the Comptroller to
consider nine factors:



 the taxpayer's audit history;

 the tax issues involved;
 a change in comptroller policy during the audit period;


 


 size and sophistication of the taxpayer;


 


 whether tax was collected but not remitted;


 


 whether returns were timely filed;


 


 completeness of records;


 


 delinquencies in other taxes;


 


 reliance on advice provided by the comptroller's office which caused
imposition of penalty and interest.




Id. § 3.5(c)(1)-(9). When reviewing an interest waiver request, Rule 3.5 requires the Comptroller
to consider three factors:



 undue delay caused by comptroller personnel;


 


 reliance on advice provided by the comptroller's office which caused
imposition of penalty and interest; and


 


 natural disasters.




Id. § 3.5(d)(1)-(3).

 In her brief on appeal, as well as her motion for summary judgment in the trial court,
the Comptroller incorrectly asserts that she was required to consider the six non-audit factors in
Rule 3.5(b) instead of the nine audit factors in Rule 3.5(c) when deciding whether to waive TGS's
penalties. (10) The Comptroller does not even reference the three factors in Rule 3.5(d) regarding
interest waivers. An agency's decision is arbitrary or results from an abuse of discretion if
the agency fails to consider relevant factors, considers an irrelevant factor, or weighs only relevant
factors but still reaches a completely unreasonable result. See City of El Paso v. Public Util.
Comm'n, 883 S.W.2d 179, 184 (Tex. 1994); Gerst v. Nixon, 411 S.W.2d 350, 360 n. 8 (Tex. 1966). 
In considering whether an agency has abused its discretion, a reviewing court must ascertain those
factors considered by the agency. See Gerst, 411 S.W.2d at 360 n.8; Consumers Water, Inc.
v. Public Util. Comm'n, 774 S.W.2d 719, 721 (Tex. App.--Austin 1989, no writ).

 As evidence that she acted within her discretion to waive only the penalty for the first
audit period, the Comptroller submitted the affidavit of Patrick Ramirez. Although Ramirez avers
that he has knowledge of the factors in Rule 3.5 to be considered when deciding whether to grant or
deny a waiver request, his affidavit does not state which factors were considered or applied by the
Comptroller in this case. Likewise, the Comptroller's worksheets, submitted as attachments to
Ramirez's affidavit, do not state which factors were considered by the Comptroller in determining
whether to grant TGS's waiver requests. With regard to the Rule 3.5 factors to be considered, the
worksheets reflect that TGS had no prior history of audit errors; TGS's returns were timely filed; (11)
TGS's records were complete; and there were no delinquencies in other taxes. There is also an
unexplained discrepancy between the two penalty worksheets because the worksheet for the first
audit period states that TGS has an internal tax/accounting department, but the worksheet for the
second audit period states that TGS has used a contract accountant for the past fifteen years, which
would have included both audit periods. Further, there is no indication on these worksheets that the
Comptroller considered whether TGS relied on advice from the Comptroller's office, which caused
the imposition of penalties or interest, or whether there was undue delay caused by Comptroller
personnel.

 The record reflects and the parties agreed that TGS had consistently relied on letter
rulings from the Comptroller's office to apportion TGS's licensing receipts. The penalty worksheet
for the first audit period states that TGS used the wrong apportionment because "the taxpayer
was not aware of the change [in law]." The penalty worksheet for the second audit period reflects
that penalties and interest were imposed for the same errors as in the first audit period--namely
TGS's use of the wrong apportionment method. Although the Comptroller issued a letter ruling
to TGS in 2002 explaining the 1997 amendments and the resulting change in the apportionment
method for TGS's licensing receipts, this letter was the only evidence of when TGS became aware
of the change in law.

 While we may presume that TGS, as a taxpayer was aware of the tax code, including
relevant changes in the tax law, see Shivers v. Texaco Exploration & Prod., 965 S.W.2d 727, 735
n.4 (Tex. App.--Texarkana 1998) (citing Mexia Indep. Sch. Dist. v. City of Mexia, 133 S.W.2d 118,
121 (Tex. 1939) (finding that taxpayer was charged with knowledge of the law)), an agency is bound
to follow its own rules and procedures. See Rodriguez v. Service Lloyds Ins. Co., 997 S.W.2d 248,
255 (Tex. 1999); Public Util. Comm'n v. Gulf States Util. Co., 809 S.W.2d 201, 207 (Tex. 1991). 
An agency abuses its discretion if it acts without reference to guiding rules or principles. See City
of Amarillo v. Railroad Comm'n, 894 S.W.2d 491, 495 (Tex. App.--Austin 1995, writ denied). 
Because we cannot ascertain whether the Comptroller considered the relevant audit factors in Rule
3.5(c) and (d)--and the Comptroller's briefing to this Court (and the district court) states that she
incorrectly considered the non-audit factors, instead of the audit factors--when deciding whether
to waive penalties and interest, we find no error in the trial court's determination that the
Comptroller abused her discretion in denying TGS's requests. See Gerst, 411 S.W.2d at 360 n.8;
Consumers Water, Inc., 774 S.W.2d at 721. We overrule the Comptroller's issue on cross-appeal.


CONCLUSION


 Having overruled the parties' issues, we affirm the trial court's judgment.




 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: August 15, 2008

1. Because the interests of the Comptroller and the Attorney General align, we refer to them
collectively as the "Comptroller." See Tex. Tax Code Ann. § 112.053 (West 2008) (requiring the
Comptroller and the Attorney General to be named as defendants in franchise tax protest suit).
2. The document entered into by TGS and each of its customers is entitled "Master License
Agreement."
3. Prior to 2008, franchise taxes were imposed based on each taxable entity's taxable capital
and earned surplus. The legislature amended the tax code, effective January 1, 2008, to impose
franchise taxes based on each taxable entity's taxable margin. See Act of May 2, 2006, 79th Leg.,
3rd C.S., ch. 1, § 2, 2006 Tex. Gen. Laws 1, 6 (amending Tex. Tax Code Ann. § 171.002). Although
we recognize that TGS was subject to the prior law during the audit periods at issue in this appeal
and, therefore, TGS's franchise taxes were based on its taxable capital and earned surplus, this
difference does not affect our analysis of the issues before us. For convenience, we cite to the
current version of the tax code unless otherwise stated.
4. "STAR" refers to the "State Tax Automated Research" System, available on the
Comptroller's website at http://cpastar2.cpa.state.tx.us/q_multi.html.
5. In 2006, the legislature amended and consolidated section 171.103 with section 171.1032. 
See Act of May 2, 2006, 79th Leg., 3rd C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 19-20.
6. Although there is a discrepancy of $5,837.43 between the total amount of penalties and
interest assessed by the Comptroller in the notices of audit results for both audit periods and the total
amount refunded to TGS in the trial court's summary judgment, neither party challenges this
discrepancy on appeal.
7. Because it does not affect our analysis, we cite to the current version of the Comptroller's
rules.
8. We likewise reject TGS's argument that it "is not in a position to know" where its
customers use the geophysical data TGS provides. The tax code requires TGS to keep adequate
records of where geophysical data is used when material to taxation. See Tex. Tax Code Ann.
§ 171.211 (West 2008) (allowing comptroller to examine records to determine franchise tax
liability); see also id. § 111.0041 (West 2008) (requiring records to be kept open for inspection
for four years); Monaghan v. Seismograph Serv. Corp., 108 So.2d 721, 724, 728-28 (Miss. 1959)
(holding that company's failure to maintain records cannot justify claim of unfair apportionment). 
Were we to adopt TGS's argument, we would "render meaningless the regulatory scheme requiring a
taxpayer to keep and produce records." See State v. Glass, 723 S.W.2d 325, 328 (Tex. App.--Austin
1987, writ ref'd n.r.e.).
9. Because the procedures for requesting a waiver in connection with an audit liability and
the factors to be considered by the Comptroller in determining whether to grant a waiver request
have not changed since Rule 3.5 was adopted in 1992, we cite to the current rule unless otherwise
noted.
10. The six non-audit factors include:



 whether the taxpayer is current in the filing of all returns;


 


 whether the taxpayer is current in the payment of all taxes and fees
due the state;


 


 whether penalty has been waived on other occasions;


 


 why penalty was previously waived or denied;


 


 whether the taxpayer has a good record of timely filing and paying
past returns; and


 


 whether the taxpayer has taken the necessary steps to correct the
problem for future filings.



34 Tex. Admin. Code § 3.5(b) (2008).
11. The worksheet for the second audit period reflects that the 2001 return was untimely and
that there was one late payment.