MONAGHAN, CHAIRMAN; STATE TAX COMMISSION *v.*
SEISMOGRAPH SERVICE CORP.

No. 40987          February 9, 1959          108 So. 2d 721

*John E. Stone,* Jackson, for appellant.

*Henley, Jones & Henley,* Jackson; *Joseph L. Hull, Jr.,* Tulsa, Oklahoma, for appellee.

McGEHEE, C. J.

This suit was filed by the appellee, Seismograph Service Corporation, incorporated under the laws of Delaware and having its principal office and place of business at Tulsa, Oklahoma, where it was maintaining such office and place of business during the taxing period in question in this case. The suit was filed against the Chairman of the State Tax Commission under the authority of Section 10124, Miss. Code of 1942, Recompiled, which provides, among other things, that "Any person improperly charged with any tax imposed by this act, and required to pay the same, may recover the amount paid together with interest, in any proper action or suit against the commissioner for the amount paid into the State Treasury * * *" The Act is known as the Sales Tax Law of this State but the same covers tax on compensation received for services rendered therein.

The incidence of the tax is upon the local activity and the protection afforded that activity by the laws of this State. While the tax in this case was originally predicated upon Section 10111, Miss. Code of 1942, Recompiled, which provides for a tax equal to 2% of the gross income of the business done in this State, the assessment herein was actually made under Section 10110 of the Miss. Code of 1942, Annotated, which provides a lesser rate of tax. Of course no point is made by the appellee-taxpayer on the specific ground that it was charged a tax at the rate of 1% on the assessment under the latter statute instead of 2% under said Section 10111.

Section 10111, Miss. Code of 1942 Recompiled, provides in part, as follows: "(1) Upon every person engaging or continuing within this state in any of the following businesses, there is likewise hereby levied and shall be collected a tax on account of the business engaged in equal to two per cent of the gross income of the business: * * * Services performed in connection with the surveying, exploring, developing, producing, distributing or testing of

oil, gas, and other mineral resources, not elsewhere taxed.' '

The appellee Seismograph Service Corporation was, during the taxing period in question, engaged in the making of seismographic surveys, with considerable equipment and personnel for the gathering of data for the location of oil and gas in Mississippi under written contracts with the California Company of New Orleans, Louisiana, the Gulf Oil Corporation of Houston, Texas, the Marshall Young Company of Fort Worth, Texas, and the Skelly Oil Company of Tulsa, Oklahoma, and in which written contracts the oil company is referred to as the "CLIENT". The appellee Seismograph Service Corporation, under the terms of the contract, was to furnish the scientific equipment necessary for the exploration of the area of land in this State designated by the client for the exploration, was to furnish the personnel for conducting the operation, and was to be reimbursed for only expendable material used in the seismographic survey, such as dynamite, etc.

The procedure in conducting the seismographic survey was for the appellee Seismograph Service Corporation to employ in the work what is called a "Basic Unit" and a "Drilling Unit", comprised of the equipment and personnel listed in exhibits to the written contract. The tax in question is based upon the gross receipts paid to the appellee by the clients for the work done by these two units in this State, which corresponded with the amount of income reported by the appellee Seismograph Service Corporation to the State Tax Commission for the period in question.

It was frankly admitted by the President of the Seismograph Service Corporation in his testimony at the trial that no charge *as such* was made in any of the invoices or mentioned in the contracts as to any services rendered outside of this State.

He referred to the scientific equipment used by the basic unit which included "the recording truck, which is connected by cable to all the detectors laid out in a straight line on the ground." He testified that "Not too far away is the shooting truck, which is connected by telephone cable to the recording truck, and again an electric line goes from the shooting truck to the shot-hole for the detonation of the dynamite. And further that "On word from the operator in the recording truck the shooter pushes the blaster, and sets off the blast of dynamite." He also told the court that the holes were drilled by the drilling unit to a depth of about sixty feet, that the hole was about four inches in diameter, and that the dynamite was placed at the bottom of this hole. The basic unit was comprised of a party chief, two computers, a party chief's car, and all necessary calculating, drafting and mapping equipment; that as a part of the crew there was an observer, assistant observer, a recorder's helper, a shooter and a shooter's helper; that the set of 24-trace seismic recording instruments included not more than fifty geophones, mounted on a standard truck, a water tank and all normal shooting accessories mounted on a standard truck; that the surveying unit consisted of a surveyor, rodman, a service automobile and a complete set of surveying instruments; and a list of the equipment and personnel of a drilling unit was also attached as an exhibit to one of the contracts which was introduced as being typical of all of the contracts involved between the Seismograph Service Corporation and its clients. He admitted that the work done in this State was by the basic drilling units, and that what the appellee got out of the field operation were the surveyor's notes, the surveyor's map of the locations, the observer's report of his records, the shooter's report as to the amount of dynamite he shot, and that the field crew would make certain preliminary calculations and computations and a preliminary progress map, and that

all of the information, maps and surveys were then mailed to the home office at Tulsa, Oklahoma, where there was a pool of expert geologists and geophysicists who interpreted the results of the data gathered by the basic units and the drilling units in Mississippi.

As required by the written contract, the appellee would then make a report to the client as to their interpretations of the results of the work done in Mississippi by the basic unit and the drilling unit.

The President of the appellee-corporation, Mr. G. S. Wesby, further testified, among other things, as follows: Q. ''Now, Mr. Wesby, as a matter of practice in your experience with your company, has the company ever set a seperate fee for the field work and for the interpretation work? A. No, it has not.'' and further: ''Q. Now, your basic unit confines its work to the shooting of the holes on location and to the correct preparation of preliminary maps, as you say—A. That's correct. Q. In their surveying, do they not? A. That's correct. * * * Q. Now, that drilling unit also is a unit that is on location (evidently meaning in the area assigned to the appellee for seismographic exploration in Mississippi) and drills the holes in which the dynamite is placed for detonation, is it not? A. That's correct. Q. Both the basic unit and drill units are used at work on location, are they not? A. That's correct.''

Mr. Wesby was also asked: ''Q. Under that provision of the contract you charged for the basic unit $8,200 a month, did you not? A. Yes, sir. Q. And under that contract you charged for the drill unit in accordance with the charges as stated in schedule (b) of the contract, did you not? A. That's correct. Q. And that was the only charge you made under that contract for services, were they not? A. Yes, sir. Q. There was no charge made for any interpretative work, was there? A. The interpretative — Q. As such? A. As set out in an invoice? Q. As set out in the contract? A. The basic fee covers the

interpretation. Q. Let me ask you my question again. There is no charge as such for interpretation work in the—on the face of the contract, is there, Mr. Wesby? A. No, that's correct. * * * Q. All right, show me some place else in the contract where there are charges made for other work. A. No, there are no other charges but they are obligations that we—Q. I know—They were covered by these fees * * * Q. I am asking you the question on the face of the contract, are there any other charges made other than those for the basic unit and the drill unit? A. No, sir. Q. Now, both the basic unit and drill unit are units that operate locally, are they not, Mr. Wesby? A. That's correct." The witness, however, further stated: "It has grown up in the seismograph industry from the very beginning that there are two parts in the seismographic survey that I have mentioned, that is, going out and getting the physical data and then following it up by the interpretation. * * *"

Notwithstanding that the president of the appellee corporation contended that there are two parts of a seismographic survey, part of the work done in the field in Mississippi and the remainder, the interpretation in Tulsa, Oklahoma, of the data gathered in Mississippi, neither the written contract nor the invoices, which were present but not introduced, in connection with the seismographic survey in Mississippi disclose that any charge was made for the interpretative work done at the home office at Tulsa, Oklahoma. The tax was assessed on the basis of the income reported by the appellee to the State Tax Commission in Mississippi. Sec. 10120, Code of 1942, Recompiled, makes it the duty of every person taxable under the Act to keep and preserve for a period of three years adequate records of the gross income, gross receipts or proceeds of sales of the business, etc.; and Sec. 10121, Code of 1942, Recompiled, provides that: "If adequate records of the gross income or gross receipts of sales are not maintained, or

invoices preserved as provided herein * * * the Commissioner may make * * * assessments from the best information obtainable, and shall give notice by registered mail of such returns and assessments, and such returns and assessments shall be prima facie correct for purposes of this Act.'' The appellee evidently got notice, since it paid the tax, under protest, on the assessment.

██ ██ The assessments, a previously stated, were made and the tax levied on the basis of the income earned by only the basic unit and the drilling unit in this state and the tax was paid in the sum of $11,176.88 by the appellee-tax-payer. But whether it was paid under protest or voluntarily is immaterial under the Act since it provides that any person improperly charged with any tax imposed by the Act, and required to pay the same, may recover the amount paid, together with interest thereon.

The trial court sustained a special demurrer as to $9,003.50 of the amount paid by the taxpayer for the reason that this amount of the tax was passed on to, and collected from, the clients, and a taxpayer who has paid an improper tax into the state treasury can only recover such part thereof as was actually borne by such taxpayer. The decree in this case in favor of the appellee Seismograph Service Corporation was therefore for only the sum of $2,678.93, with interest from the date of payment until the date of the decree in the amount of $626.50, and the decree provides for interest at the legal rate of 6% thereafter until paid.

██ ██ On the question of whether or not the trial court was correct in rendering a decree in favor of the appellee for a refund of the portion of the tax last above-mentioned, the chancellor made no separate finding of fact, but held as a matter of law that the assessment of this tax by the State Tax Commission (a) constituted a burdening of Interstate Commerce in violation of Article I, Section 8 of the Constitution of the United States; and (b) that the assessment and collection of

the tax constituted the taking of private property without due process of law as prohibited by the Fourteenth Amendment to the Constitution of the United States.

We are of the opinion that the only questions presented on this appeal are questions of law, there being no conflict in the evidence as to any material fact, that is to say, the issue here is whether either of the grounds upon which the decree was based is correct. We are not therefore confronted with the question of whether or not any finding of fact by the trial court is manifestly wrong as being against the overwhelming weight of the evidence.

We do not think that the assessment and collection of the tax constituted a burdening of interstate commerce within the meaning of the Commerce Clause of the Federal Constitution as construed by the Supreme Court of the United States in upholding numerous decisions of this Court wherein we have upheld the tax under the Act in question, as a tax upon a local activity engaged in within this State by the person or corporation against whom the tax is assessed.

The appellee relies strongly upon the case of Freeman v. Hewit, 91 L. Ed. 265, 329 U. S. 249, decided in 1946, involving the sale of securities in interstate commerce. However, if that decision be applicable, and we do not think that it is, since there was no local activity such as manufacturing or exploration as a business involved, the Supreme Court of the United States on June 30, 1949, upheld the decision of this Court in the case of Interstate Oil Pipe Line Company v. Stone, Chairman, State Tax Commission, reported in 203 Miss. 715, 35 So. 2d 73, 36 So. 2d 142, 93 L. Ed. 1615, 337 U. S. 662, in which was involved a tax under our present statute on the local activity of the Interstate Oil Pipe Line Company which line extended from the lease tanks in oil fields in south Mississippi to a point on a railroad where the oil was loaded into railroad tank cars

and shipped in interstate commerce. The tax assessed by this State against the local activity of this pipeline was upheld by the Supreme Court of the United States notwithstanding that the transportation of the oil to the railroad was an integral part of its transportation from the oil fields to points outside of this State, and where the transportation by the Interstate Oil Pipe Line Company from the oil field in this State to the point on the railroad in this State was a local activity and the transportation by the railroad thence to points out of the State was interstate commerce. See also Stone, Chairman, State Tax Commission v. Stapling Machines Co., 220 Miss. 470, 71 So. 2d 205, 348 U. S. 802, 99 L. Ed. 633; and Stone, Chairman, State Tax Commission v. Stapling Machine Co., 221 Miss. 555, 73 So. 2d 123, 348 U. S. 907, 99 L. Ed. 711.

In the case of Cook v. Stone, Chairman of State Tax Commission, 192 Miss. 219, 5 So. 2d 223, we held that a tax against a contractor was based on the local activity and was for the protection afforded by the State during the progress of the work, and was a valid tax and in the course of the opinion, we said: "* * * The tax, we repeat, is upon the local activity of doing this work, not upon the issue of its ultimate acceptance and the payment thereof as a finished product."

In the case of Stone, Chairman of the State Tax Commission v. York Ice Machinery Corporation, 193 Miss. 638, 10 So. 2d 380, but which the taxpayer did not see fit to appeal, there was involved a tax against the local activity for the installation, adjustment and testing of certain air conditioning systems in buildings in this State, where the air conditioning systems had been manufactured out of this State and shipped here in interstate commerce, and we held that although the installation, adjustment and testing of the air conditiong systems constituted a substantial part of the performance of the contract for the sale of the machinery and equipment

which was shipped here in interstate commerce, the local activity of the experts who installed, adjusted and tested the systems in this State was subject to the tax and that the same was not a prohibitive burden on interstate commerce. We further held that the fact that the installation, adjustment and testing of the air conditioning systems constituted a substantial portion of the performance of the contract of sale, as a condition precedent to final acceptance by the purchasers, did not prevent the local activity from being subject to the tax.

██ We do not think that the case of Gross Income Tax Division, Indiana Department of State Revenue, State of Indiana v. Surface Combustion Corporation, 232 Ind. 100, 111 N. E. 2d 50, certiorari denied, 346 U. S. 829, 98 L. Ed. 353, is in conflict with the decision being rendered by us in the case at bar. The appellee in its brief recognizes that "a tax on an interstate sale, coupled with the installation services may be *invalid* where the skill and peculiar knowledge required in such installation services were *not* such as were 'intrinsically related to and inherently a part of the sale * * *' " (Emphasis supplied.) But here the work done in Mississippi was "intrinsically related to and inherently a part of" the operation in question. In fact, the work done in this State was essential to the interpretative work done in the appellee's home office at Tulsa, Oklahoma, but we see no reason why the appellee should not have separated the charges for the value of the work done in Mississippi from the value of the work done in Tulsa, Oklahoma, but which it failed to do. Moreover, we think that the requirement of the statute for the taxpayer to keep adequate records is a reasonable exercise of the legislative power and was an essential requirement to enable the State Tax Commissioner to properly administer the Sales (or service) Tax Law.

In the case of McGoldrick v. Berwind-White Coal Mining Company, 309 U. S. 32, 33, 60 S. Ct. 388, 84 L. Ed.

565, which we cited in the case of Stone, State Tax Commissioner v. York Ice Machinery Corporation, supra, held, among other things, that: "* * * it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business, Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 254, 58 S. Ct. 546, 548, 82 L. Ed. 823, 115 A. L. R. 944. Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless falls short of the regulation of the commerce which the Constitution leaves to Congress."

In the instant case we are unable to conceive how this tax unconstitutionally interferes with interstate commerce or can amount to double taxation, since the State of Oklahoma would be without power to tax the local activity of the appellee in this State, which is here involved. By the expedient of keeping adequate records by the appellee, the appellant State Tax Commission would have been able to apportion the tax on the local activity so that it would not embrace any receipts for the services rendered by the taxpayer in the State of Oklahoma in the interpretation of the data obtained here as to subsurface structures. But according to the undisputed testimony in this record, no separate charge was made *as such* by the appellee for the services rendered in Oklahoma; the tax was imposed upon the gross receipts and income reported by the appellee to the State Tax Commission of Mississippi "from the best information obtainable," to wit: the report of the appellee of its income made to the State Tax Commission from the activities of the basic and drilling units in this State. A taxpayer engaged in local activities in this State that

is connected with interstate commerce should not be permitted to commingle its income received from activities in another state with the income received from activities in this State, and then be heard to complain that the tax is imposed upon unapportioned income, where such unapportionment is due to the failure of the taxpayer to comply with the law in regard to keeping adequate records as to the income received from activities performed in this State, and where the taxpayer may thereby escape paying tax on this income anywhere.

In the case of Freeman v. Hewit, supra, the Supreme Court of the United States was not in accord with the view of one of the justices who was apprehensive that the Court was there reversing the trend of its former decisions in regard to the right of a state to impose a tax upon a local activity. In fact, no local activity of any consequence was involved in that case.

■■■ Again, the burden was on the appellee to show that the tax here involved violated the commerce clause of the Federal Constitution. To meet that burden, the appellee only undertook to show that the services rendered in Oklahoma, though not charged for under the contracts and invoices here involved, were a part of, and included in, the base fee collected from the client in connection with the local activities in this State; but the appellee, which alone knew the facts, failed to show what portion of the base fee should be allocated to the services rendered in Oklahoma, and failed to disclose the information upon which the tax claimed for activities in this State could be apportioned,—a part to Mississippi and a part to Oklahoma—in compliance with the reasonable requirement of our statute, which made it necessary for the State Tax Commissioner to make the assessment on the best information obtainable. The Commissioner was justified in using the information furnished by the taxpayer to the State Tax Commission in its return of its income received for its activities in this State. In re-

sponse to interrogatory No. 3, contained in the appellee's pleadings, the appellee conceded upon the trial that the gross income reflected on its state income tax return here was the same figure upon which the tax here involved was imposed.

The appellee in the instant case is not in position to complain that the tax in question was assessed against unapportioned income (if such was the case), since the State Tax Commissioner, as aforesaid, was not furnished information upon which he could determine how much the taxpayer owed so as to enable him to allocate any definite portion of the gross receipts reported to him as income of the taxpayer in this State, other than by the method of imposing the tax upon the income reported to the Commission by the taxpayer as income earned in this State. If the taxpayer is having to pay more taxes on the amount received for services performed in this State than it would have had to pay thereon if a part of its total income had been apportioned to the Tulsa, Oklahoma office, the increased exaction would be due to the failure of the taxpayer to keep adequate records in order that the proper allocation could be made.

The only records shown to have been kept by the taxpayer were the written contracts introduced in evidence and the invoices presented, but not introduced in evidence, for the work done and the price received, and there was nothing in the contract or invoice to show that any part of the charge was for services performed in Oklahoma, as hereinbefore stated, notwithstanding that the president of appellee-corporation testified that the charges for the interpretative services in Tulsa, Oklahoma, were included in the basic fee of $1,975 per week for the basic unit and $450 for the drilling unit. As heretofore shown, the Act in question required that this and all other taxpayers should keep adequate records in order that the Commissioner may determine how much the taxpayer owes the State.

■■ It is a matter of common knowledge that the operation of these two units by the appellee and others engaged in seismograph explorations in this State is a local activity of considerable magnitude and is carried on throughout the State.

■■ We recognize that the Supreme Court of New Mexico has in the case of Seismograph Service Corporation v. Bureau of Internal Revenue, 293 P. 2d 977, reached a contrary conclusion as to whether or not such a tax here involved was a burden on interstate commerce, and while we have great respect for the decisions of other state courts we feel it our duty to follow the rule that they are not necessarily binding on this Court, according to what is said in 21 C. J. S., Sec. 204, p. 356; and Mast, Foos and Company v. Stover Mfg. Company, 177 U. S. 485, 44 L. Ed. 856. We are, like the Supreme Court of New Mexico, endeavoring to follow the previous decisions of our Court, some of which have been affirmed by the Supreme Court of the United States, as hereinbefore shown.

As hereinbefore stated, since the unapportionment of the tax as between the work done in Mississippi and that done in Oklahoma is due to the failure of the taxpayer to keep such records as would enable the Commissioner to make the proper apportionment, the taxpayer is in no position to complain that the State Tax Commission assessed it on the basis of its reported earnings in this State—"the best information obtainable." There was not, and could not have been, an additional exaction of such a tax, on the same income from these local activities made by the State of Oklahoma.

We are therefore of the opinion that the decree of the trial court should be reversed and the case dismissed.

Reversed and judgment here for appellant.

*Lee, Kyle, Holmes* and *Arrington, JJ.,* concur.