# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00640-CV

**Appellant, TGS-NOPEC Geophysical Company// Cross-Appellants, Susan Combs, Successor-in-Interest to Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas**

**v.**

**Appellees, Susan Combs, Successor-in-Interest to Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas// Cross-Appellee, TGS-NOPEC Geophysical Company**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. D-1-GN-05-000637, HONORABLE GISELA D. TRIANA, JUDGE PRESIDING

## O P I N I O N

This appeal arises from a franchise tax dispute involving the apportionment of gross receipts from the licensing of geophysical and seismic data. The parties filed cross-motions for summary judgment, and the trial court granted summary judgment in favor of the Comptroller[1] on the issue of tax liability but, finding that the Comptroller abused her discretion in denying appellant TGS-NOPEC Geophysical Company's requests to waive penalties and interest, the trial court granted summary judgment to TGS on that issue. TGS appeals the trial court's summary

---

[1] Because the interests of the Comptroller and the Attorney General align, we refer to them collectively as the "Comptroller." *See* Tex. Tax Code Ann. § 112.053 (West 2008) (requiring the Comptroller and the Attorney General to be named as defendants in franchise tax protest suit).

judgment of tax liability, and the Comptroller cross-appeals from the trial court's summary judgment reversing the imposition of penalties and interest. Because we find no error, we affirm the trial court's judgment.

## BACKGROUND

TGS licenses geophysical and seismic data to its customers throughout the United States and abroad. This data is used by oil and gas companies to explore for and develop oil and gas deposits and can be licensed to more than one customer. TGS charges each customer a flat fee for a non-exclusive license to use the data.[2] The data is typically provided to customers on magnetic tape. Once the data is delivered to the customer, the customer uses the data at its discretion with limited restrictions on transferability and who can view the data.

The State of Texas imposes franchise taxes on each business, or taxable entity, that does business in this state. *See* Tex. Tax Code Ann. § 171.001 (West 2008). Franchise taxes are imposed annually based on business done in Texas during the previous accounting year. *Id.* § 171.1532 (West 2008). Subject to various exceptions and exemptions, the franchise tax rate for most businesses is one percent of that business's taxable margin.[3] *Id.* § 171.002 (West 2008).

---

[2] The document entered into by TGS and each of its customers is entitled "Master License Agreement."

[3] Prior to 2008, franchise taxes were imposed based on each taxable entity's taxable capital and earned surplus. The legislature amended the tax code, effective January 1, 2008, to impose franchise taxes based on each taxable entity's taxable margin. *See* Act of May 2, 2006, 79th Leg., 3rd C.S., ch. 1, § 2, 2006 Tex. Gen. Laws 1, 6 (amending Tex. Tax Code Ann. § 171.002). Although we recognize that TGS was subject to the prior law during the audit periods at issue in this appeal and, therefore, TGS's franchise taxes were based on its taxable capital and earned surplus, this difference does not affect our analysis of the issues before us. For convenience, we cite to the current version of the tax code unless otherwise stated.

2

Section 171.101 of the tax code describes the calculation used to determine taxable margin. *Id.* § 171.101 (West 2008). To determine the amount of franchise tax owed, a business's taxable margin must be apportioned between business done in Texas and business done elsewhere. *Id.* § 171.106 (West 2008). This calculation is done by multiplying a business's taxable margin by a fraction, the numerator of which is the business's gross receipts from business done in Texas, and the denominator of which is the business's gross receipts from all of its business. *Id.* §§ 171.103 (determining gross receipts for business done in Texas); .105 (determining gross receipts for entire business); .106(a) (apportioning taxable margin) (West 2008).

This appeal concerns a dispute about the numerator, or TGS's gross receipts for business done in Texas. The tax code currently requires TGS to pay franchise taxes based on its gross receipts for its licensing activities in Texas. *See id.* §§ 171.002, .103(a)(4). Prior to 1997, the tax code did not specify how to apportion gross receipts from licensing activities for franchise tax purposes. *See* Act of Aug. 13, 1991, 72nd Leg., 1st C.S., ch. 5, § 8.06, 1991 Tex. Gen. Laws 134, 156 (codified as amended at Tex. Tax Code Ann. § 171.103(4)); Act of May 27, 1993, 73rd Leg., R.S., ch. 546, § 3, 1993 Tex. Gen. Laws 2043, 2043 (codified as amended at Tex. Tax Code Ann. § 171.1032(a)(4)). TGS therefore relied on opinions and letter rulings issued by the Comptroller to apportion its gross receipts and calculate the amount of franchise taxes owed. Prior to 1997, for franchise tax purposes, the Comptroller treated the licensing of geophysical and seismic data as "sales of an intangible" and apportioned gross receipts from licensing activities based on the location of the payor. *See* Tex. Comptroller of Pub. Accounts, STAR Document Nos. 9103L1087B07 (issued Mar. 8, 1991), *available at* http://aixtcp.cpa.state.tx.us/opendocs/open07/1087b07l.html;

3

9005L1019F09 (issued May 23, 1990), *available at* http://aixtcp.cpa.state.tx.us/opendocs/open07/1019f09l.html; 8209T0476C03 (issued Sept. 10, 1982), *available at* http://aixtcp.cpa.state.tx.us/opendocs/open28/0476c03t.html.[4]  Finding that patents, copyrights, trademarks, licenses and franchises were "types of similar intangible assets," the legislature amended the tax code, effective January 1, 1998, to tax trademarks, franchises, and licenses in the same manner as patents and copyrights.  *See* Act of May 30, 1997, 75th Leg., R.S., ch. 1185, §§ 5-6, 1997 Tex. Gen. Laws, 4569, 4569-70 (effective Jan. 1, 1998) (originally codified at Tex. Tax Code Ann. §§ 171.103(4), .1032(a)(4)).[5]  The fiscal note estimate prepared by the Comptroller for the 1997 amendments provided in relevant part:

> Current franchise tax law sources the receipts from trademarks, franchises, and licenses used in Texas to the state of legal domicile of the corporation remitting the payments. [Receipts from p]atents and copyrights are [apportioned] to Texas if the patent or copyright [is] *used* in Texas.  This bill would equalize treatment among these types of similar intangible assets:  The receipts would be [apportioned] to Texas if the assets were *used* in Texas. . . . The changes related to sourcing receipts from certain intangible assets would provide a small revenue gain.

Comptroller of Pub. Accounts, Fiscal Note Estimate, Tex. S.B. 861, 75th Leg., R.S. (1997) (emphasis added). As a result of the 1997 amendments, taxpayers like TGS were required to apportion gross receipts from licensing activities based on the location of *use* instead of the location of the payor.  *See* Tex. Tax Code Ann. § 171.103(4).

---

[4]  "STAR" refers to the "State Tax Automated Research" System, available on the Comptroller's website at http://cpastar2.cpa.state.tx.us/q_multi.html.

[5]  In 2006, the legislature amended and consolidated section 171.103 with section 171.1032. *See* Act of May 2, 2006, 79th Leg., 3rd C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 19-20.

The Comptroller audited TGS and assessed additional franchise taxes, penalties, and interest of approximately $1.8 million for the 1997-2000 and 2001-2003 audit periods. These assessments arose from TGS's failure to correctly apportion its gross receipts as required under the 1997 amendments to sections 171.103 and 171.1032 of the tax code. On December 6, 2004, the Comptroller issued an amended notice of audit results for the 1997-2000 audit period finding that TGS owed additional franchise taxes in the amount of $232,437.46, plus interest of $78,489.33. The Comptroller issued a notice of audit results for the 2001-2003 audit period on December 7, 2004, finding that TGS owed additional franchise taxes in the amount of $1,162,310.65, plus penalties of $116,231.07 and interest of $139,021.20.

After evaluating the factors listed in Comptroller administrative rule 3.5, the Comptroller waived the penalty for the first audit period but denied waiver of the penalty for the second audit period. *See* 34 Tex. Admin. Code § 3.5 (2008). The Comptroller also denied TGS's request to waive interest for both audit periods. TGS paid the additional taxes, penalties, and interest under protest and filed suit to recover a refund as permitted under section 112.052 of the tax code. *See* Tex. Tax Code Ann. § 112.052 (West 2008).

TGS and the Comptroller filed cross-motions for summary judgment. The trial court granted summary judgment in favor of the Comptroller on the tax liability issue and concluded that TGS's tax liability for the two audit periods in question was $1,394,748.11. The trial court denied the Comptroller's motion for summary judgment on the issue of penalties and interest and granted summary judgment in favor of TGS concluding that TGS should be awarded a refund of all penalties and interest assessed and paid for both audit periods in the amount of $339,579.03, plus interest

5

from the date paid.[6] On appeal, TGS challenges the trial court's summary judgment in favor of the Comptroller on the issue of tax liability, and the Comptroller challenges the trial court's summary judgment in favor of TGS on the issue of penalties and interest.

## ANALYSIS

In three issues, TGS complains that the trial court erred in determining TGS was liable for additional franchise taxes. First, TGS argues that the trial court incorrectly determined that former sections 171.103(4) and 171.1032(4) applied to the gross receipts generated by TGS from its licensing activities. Second, TGS argues that the trial court erred in its conclusion that the Comptroller was uniformly assessing and collecting franchise taxes and, therefore, was not in violation of the United States and Texas Constitutions. Finally, TGS argues that the trial court erred in affirming the Comptroller's use of TGS's customers' shipping or billing address as the location of license use. The Comptroller counters that the trial court correctly applied the relevant statutory provisions to determine that TGS was liable for additional franchise taxes; the trial court correctly concluded that the Comptroller did not violate the United States or Texas Constitution; and, based on the evidence in the record, the trial court correctly affirmed the Comptroller's use of shipping or billing address as the location of license use. On cross-appeal, however, the Comptroller asserts

---

[6] Although there is a discrepancy of $5,837.43 between the total amount of penalties and interest assessed by the Comptroller in the notices of audit results for both audit periods and the total amount refunded to TGS in the trial court's summary judgment, neither party challenges this discrepancy on appeal.

that the trial court erred in its conclusion that the Comptroller abused her discretion in imposing penalties and interest against TGS. For the reasons set forth below, we find no error in the trial court's judgment.

***Standard of Review***

We review the trial court's decision to grant summary judgment *de novo*. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994). The standards for reviewing a traditional summary judgment are well established: the movant must show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; in determining whether there is a disputed material fact issue precluding summary judgment, the reviewing court must accept all evidence in favor of the nonmovant as true; and the court must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in the nonmovant's favor. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). A plaintiff must establish all elements of the cause of action as a matter of law. Tex. R. Civ. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). A defendant, however, must disprove at least one essential element of each of the plaintiff's theories of recovery or conclusively establish each element of an affirmative defense to prevail. *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996).

As a general rule, a party may not appeal the denial of a motion for summary judgment because it is an interlocutory order and, therefore, is not appealable. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996). However, when both parties move for summary judgment and the district court grants one motion and denies the other, the unsuccessful party

may appeal both the grant of the prevailing party's motion and the denial of its own. *See Holmes v. Morales*, 924 S.W.2d 920, 922 (Tex. 1996). In these circumstances, we review the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Commissioners Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). Where the district court does not state the basis for granting summary judgment, the appellant must negate all grounds that support the judgment. *See State Farm Fire & Cas. Co. v. S.S. & G.W.*, 858 S.W.2d 374, 381 (Tex. 1993); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). If the appellant fails to negate each ground on which the judgment may have been rendered, we must uphold the summary judgment. *See Carr*, 776 S.W.2d at 569.

### TGS's Tax Liability

In its first issue, TGS challenges the trial court's interpretation and application of former sections 171.103(4) and 171.1032(a)(4). TGS argues that its business activities include *sales* of intangible assets and that it derives no benefit from the "use of its licenses." Therefore, for purposes of calculating its franchise tax liability, TGS argues that it is not subject to sections 171.103(4) and 171.1032(a)(4) as they existed at the time. We disagree.

As a preliminary matter, sections 171.103(4) and 171.1032(a)(4) were amended in 1997 during the first audit period. Prior to the 1997 amendments, these statutes provided, in relevant part:

8

**Section 171.103.  Determination of Gross Receipts from Business Done in this State for Taxable Capital.**

In apportioning taxable capital, the gross receipts of a corporation from its business done in this state is the sum of the corporation's receipts from . . . (4) each royalty for the use of a patent or copyright in this state . . . .

*See* Act of Aug. 13, 1991, 72nd Leg., 1st C.S., ch. 5, § 8.06, 1991 Tex. Gen. Laws 134, 156 (current version at Tex. Tax Code Ann. § 171.103).

**Section 171.1032.  Determination of Gross Receipts from Business Done in this State for Taxable Earned Surplus.**

(a)     Except for the gross receipts of a corporation that are subject to the provisions of Section 171.1061, in apportioning taxable earned surplus, the gross receipts of a corporation from its business done in this state is the sum of the corporation's receipts from . . . (4) each royalty for the use of a patent or copyright in this state . . . .

*See* Act of May 27, 1993, 73rd Leg., R.S., ch. 546, § 3, 1993 Tex. Gen. Laws 2043, 2043 (since amended and consolidated with Tex. Tax. Code Ann. § 171.103).  Thus, prior to 1997, these statutes did not expressly provide for the apportionment of gross receipts from licenses or licensing activities. In light of this omission, TGS relied on opinions from the Comptroller, which treated TGS's licensing activities as the sale of an intangible and apportioned gross receipts from such activities based on the location of the payor.  *See* Tex. Comptroller of Pub. Accounts, STAR Document Nos. 9103L1087B07 (issued Mar. 8, 1991); 9005L1019F09 (issued May 23, 1990); 8209T0476C03 (issued Sept. 10, 1982).

At the Comptroller's request, the legislature amended the statutes, effective January 1, 1998, to provide for the apportionment of gross receipts from licenses based on the location of use. These amendments provided in relevant part:

> **Section 171.103.  Determination of Gross Receipts from Business Done in this State for Taxable Capital.**
>
> In apportioning taxable capital, the gross receipts of a corporation from its business done in this state is the sum of the corporation's receipts from . . . (4) the *use* of a patent, copyright, trademark, franchise, or *license* in this state . . . .

*See* Act of May 30, 1997, 75th Leg., ch. 1185, § 5, 1997 Tex. Gen. Laws 4569, 4569-70 (current version at Tex. Tax Code Ann. § 171.103) (emphasis added) ("former § 171.103(4)").

> **Section 171.1032.  Determination of Gross Receipts from Business Done in this State for Taxable Earned Surplus.**
>
> (a)    Except for the gross receipts of a corporation that are subject to the provisions of Section 171.1061, in apportioning taxable earned surplus, the gross receipts of a corporation from its business done in this state is the sum of the corporation's receipts from . . . (4) the *use* of a patent, copyright, trademark, franchise, or *license* in this state . . . .

*See id.*, § 6, 1997 Tex. Gen. Laws 4569, 4570 (since amended and consolidated with Tex. Tax. Code Ann. § 171.103) (emphasis added) ("former § 171.1032(a)(4)").  Thus, the amendments expressly provided for apportionment of gross receipts from licenses based on the location of use.

TGS argues that the trial court erred in applying the 1997 amendments to TGS's licensing activities.  The crux of TGS's argument is that TGS derives no benefit from its customers' use of the seismic data provided by TGS; therefore, TGS derives no benefit from the use of a license.

TGS's argument misses the mark. The evidence showed that TGS and its customers enter into a contract entitled "Master License Agreement," which allows the customer to use, or license, TGS's proprietary seismic data. This agreement is non-exclusive in that TGS may license the same data to multiple customers. Under the terms of the agreement, TGS's customers are designated as "licensees," and each customer pays a flat fee to TGS for the privilege of using TGS's proprietary seismic data.

The question whether TGS's activities fall within the meaning of former §§ 171.103(4) and 171.1032(a)(4) presents a matter of statutory construction. Our primary goal when construing a statute is to determine and give effect to the legislature's intent. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). We begin with the plain language of the statute at issue and apply its common meaning. *Id.* Where the statutory text is unambiguous, we adopt a construction supported by the statute's plain language, unless that construction would lead to an absurd result. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999).

Based on the plain language of former §§ 171.103(4) and 171.1032(a)(4) and the evidence in the record, we conclude that the payments received by TGS for licensing its customers to use proprietary seismic data are gross receipts from the use of a license. *See* Former §§ 171.103(4), .1032(a)(4). We reject TGS's argument that its customers, or licensees, are the intended taxpayers under former §§ 171.103(4) and 171.1032(a)(4). The gross receipts earned by TGS are derived from TGS's use of a license within the meaning of the statutes. In contrast, TGS's customers earn gross receipts from the use of TGS's data through the subsequent provision of exploration or production services or the sale of tangible or intangible personal property—*e.g.*,

11

oil, gas, or other geothermal resources. The customers' gross receipts do not arise from the use of a license. Accordingly, we find no error in the trial court's judgment concluding that former §§ 171.103(4) and 171.1032(a)(4) applied to the gross receipts generated from TGS's licensing activities. We overrule TGS's first issue.

### Constitutional Claims

#### 1.    Uniform Assessment

In its second issue, TGS argues that the trial court erred in its conclusion that the Comptroller was uniformly assessing and collecting franchise taxes. TGS contends that the Comptroller has violated equal protection by assessing non-uniform franchise taxes against similarly situated taxpayers. In support of this claim, TGS complains that the Comptroller apportions gross receipts from the sales and licensing of computer programs based on location of the payor and that because TGS's licensing of its proprietary seismic data is similar to the transfer of a computer program, the Comptroller should likewise apportion TGS's gross receipts based on location of the payor.

The United States Constitution requires equal protection of the law. *See* U.S. Const. amend. XIV, § 1. The requirements for equal protection under the United States Constitution and equal and uniform taxation under the Texas Constitution are substantially the same. *See Railroad Comm'n v. Channel Indus. Gas Co.*, 775 S.W.2d 503, 507 (Tex. App.—Austin 1989, writ denied). The Texas Constitution's mandate that all taxes be equal and uniform requires that all persons falling within the same class be taxed alike. *See Sharp v. Caterpillar, Inc.*, 932 S.W.2d 230, 240 (Tex. App.—Austin 1996, writ denied). We begin with the presumption that tax statutes, like other

12

statutes, are constitutional, and the party challenging the constitutionality of a statute bears the burden of demonstrating that it fails to satisfy constitutional requirements. *See Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 934 (Tex. 1996); *Vinson v. Burgess*, 773 S.W.2d 263, 266 (Tex. 1989). The presumption of constitutionality is especially strong with tax statutes. *Vinson*, 773 S.W.2d at 266. Like other economic measures that do not involve a fundamental right or interest, tax statutes are subject to a rational basis standard of equal protection and due process review. *See Rylander v. B & A Mktg. Co.*, 997 S.W.2d 326, 333 (Tex. App.—Austin 1999, no pet.) (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *Williamson v. Lee Optical*, 348 U.S. 483, 491 (1955)). In other words, the statute will be upheld against an alleged violation of equal protection or due process so long as it bears a rational relationship to a legitimate state interest. *See id.* Tax classifications are likewise subject to rational basis review. *See Caterpillar, Inc.*, 932 S.W.2d at 240; *see also B & A Mktg. Co.*, 997 S.W.2d at 333.

The legislature has given the Comptroller broad discretion to adopt rules for the collection of taxes and other revenues so long as the Comptroller's rules do not conflict with the laws of this state or the constitution of this state or the United States. *See* Tex. Tax. Code Ann. § 111.002(a) (West 2008). Franchise tax rules 3.549 and 3.557 classify revenues from licenses and software sales into different categories. *See* 34 Tex. Admin. Code §§ 3.549(e)(7), (30)(A) .557(e)(6), (25)(A) (2008).[7] Rule 3.549(e)(30)(A) provides that gross receipts from licenses are apportioned based on the location of use:

---

[7] Because it does not affect our analysis, we cite to the current version of the Comptroller's rules.

(iii)    . . . For reports that are originally due on or after January 1, 1998, revenue that the owner of a trademark, franchise, or license receives is included in Texas receipts to the extent the trademark, franchise, or license is used in Texas. Paragraph (7) of this subsection controls the treatment of receipts from the sale/licensing of computer programs.

34 Tex. Admin. Code § 3.549(e)(30)(A). In contrast, "[p]aragraph (7) of this subsection" provides that gross receipts from the sales of computer programs are apportioned based on the location of the payor:

(7) Computer services and programs. . . . Receipts from the sale of a computer program (as the term "computer program" is defined in § 3.308 of this title (relating to Computers—Hardware, Software, Services and Sales)) are receipts from the sale of an intangible asset and are apportioned to the legal domicile of the payor.

*Id.* § 3.549(e)(7). The Comptroller's rules thus establish different apportionment methods for gross receipts from the sales of computer programs and gross receipts received by an owner of a trademark, franchise, or license. *Cf.* 34 Tex. Admin. Code § 3.549(e)(7) *with id.* § 3.549(30)(A)(iii).

TGS contends that the Comptroller has violated equal protection because she apportions receipts from TGS's licensing activities differently than receipts from the licensing activities of computer software companies. The crux of TGS's argument is that TGS is taxed differently than computer software companies, not other geophysical data companies. This Court has previously recognized that a difference in industry products, operations, or business organization will justify a difference in tax classification, so long as all persons within the same class are taxed similarly. *See Caterpillar, Inc.*, 932 S.W.2d at 241 (finding no equal protection violation where similar groups of taxpayers were taxed similarly). Moreover, the United States Supreme Court has

consistently held that "[i]n structuring internal taxation schemes the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (quoting *Williams v. Vermont*, 472 U.S. 14, 22 (1985)) (internal quotation omitted); *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359 (1973); *see also Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 547 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."); *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 509 (1937) ("This Court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption, infringe no constitutional limitation.").

TGS has provided no proof that it was taxed differently than other geophysical data companies. The Comptroller asserts that the franchise tax rules meet constitutional standards because they are rationally related to a legitimate state purpose. Specifically, the Comptroller asserts that software companies and geophysical data companies "make different products, have different customers, and operate differently." The Comptroller argues that establishing a rule that apportions receipts of geophysical data companies differently than receipts of computer software companies has a legitimate state purpose. Unlike TGS, a software company does not necessarily negotiate and sign individual license agreements with each of its customers. The Comptroller thus suggests "administrative convenience" as one reason for its different rules of apportionment because it would be impractical for software companies to determine "where millions of off-the-shelf computer programs (including games) were being used."

15

In *Carmichael v. Southern Coal & Coke Company*, the Supreme Court explained,

> A legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it.

301 U.S. at 509. The Supreme Court confirmed that "administrative convenience" is sufficient justification for the difference in treatment for different classes of taxpayers. *Id.* at 511. TGS has failed to show that its licensing activities are similar to those of computer software companies. For this reason, we reject TGS's claim that the Comptroller violated equal protection or due process by establishing a rule that treats computer software companies differently than geophysical data companies. We overrule TGS's second issue.

### 2. *Fair Apportionment*

In its third issue, TGS argues that the trial court erred in affirming the Comptroller's decision to use shipping or billing address as the location of use to calculate TGS's franchise taxes. As we understand TGS's argument, TGS contends that, by using TGS's customers' shipping or billing address to determine the location of use, the Comptroller has unfairly apportioned a larger share of TGS's gross receipts to Texas and has thereby subjected TGS to higher franchise taxes in violation of the Commerce Clause.

The United States Supreme Court has established a four-part test to review the validity of a state tax under the Commerce Clause. *See Complete Auto Transit v. Brady*, 430 U.S. 274, 278-79, 288 (1977). To satisfy this test: (1) the taxing state must have a sufficient nexus, or

16

contact with the taxed activity or entity; (2) the tax must be fairly apportioned; (3) the tax must be fairly related to the benefits, opportunities, and protection conferred by the taxing state; and (4) the tax must not discriminate against interstate commerce. *See id.* TGS contests only whether the Comptroller has fairly apportioned TGS's gross receipts to Texas. Therefore, we consider only that aspect of the four-part test.

The purpose of fair apportionment "is to ensure that each State taxes only its fair share of an interstate transaction." *Goldberg v. Sweet*, 488 U.S. 252, 262 (1995); *see also Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 166 (1983). To be fairly apportioned a tax must be both internally and externally consistent. *See Container Corp.*, 463 U.S. at 169. To be internally consistent, a tax must be structured in a way that, if every state imposed an identical tax, no multiple taxation would result. *Goldberg*, 488 U.S. at 261. The Texas apportionment formula is internally consistent because it employs a location of use rule. *See generally* Tex. Tax Code Ann. § 171.103(4); 34 Tex. Admin. Code § 5.349(e)(30)(A)(iii). Under this rule, TGS's licensing activities are apportioned to Texas if the license is used in Texas. If this rule was adopted by all states, the formula would allocate the gross receipts from each of TGS's licenses in the numerator of the apportionment factor based on the location of use, and no sale would be included in the numerator for more than one state. *See Goldberg*, 488 U.S. at 264; *see also Hoffman-LaRoche, Inc. v. Franchise Tax Bd.*, 161 Cal. Rptr. 838, 841 (Cal. Ct. App. 1980). Because no more than 100% of TGS's gross receipts would be taxed by all states, there is no risk of multiple taxation. Accordingly, we conclude that the Texas apportionment formula is internally consistent.

17

In addition to being internally consistent, the Commerce Clause also requires apportionment formulas to be externally consistent—*i.e.*, there must be a reasonable relationship between the tax base apportioned to a state and the intrastate values of the taxpayer's business. *See Amerada Hess Corp. v. Director, Div. of Taxation*, 490 U.S. 66, 75 (1989). As the Supreme Court has explained, "[I]n order to show unfair apportionment, a taxpayer 'must demonstrate that there is no rational relationship between the income attributed to the State and the intrastate values of the enterprise.'" *Id.* (quoting *Container Corp.*, 463 U.S. at 180). The evidence shows that TGS's Texas customers use the licenses purchased from TGS in Texas. Because Texas affords protections and benefits to TGS for the use of its licenses in Texas, the state may fairly tax the gross receipts derived from TGS's licensing activities in Texas. *See id.* We conclude that the Texas apportionment formula is externally consistent.

To the extent TGS challenges the Comptroller's use of TGS's customers' shipping or billing address to determine the location of use, we find no merit in TGS's argument. The tax code directs the Comptroller to "determine the amount of tax to be paid from information contained in the [tax] report *or any other information available to the Comptroller*." Tex. Tax Code Ann. § 111.008 (West 2008) (emphasis added). The record shows that the Comptroller apportioned TGS's gross receipts based on location of use within the meaning of the relevant statutes. *See* Former §§ 171.103(4), .1032(a)(4). The only evidence TGS provided to the Comptroller regarding location of use included summary reports identifying TGS's customers' shipping or billing addresses. In the absence of other evidence, we conclude that the Comptroller's use of TGS's customers' shipping or billing address to determine location of use was reasonable. *See generally*

18

*Bullock v. Hewlett-Packard Co.*, 628 S.W.2d 754, 756 (Tex. 1982) (upholding comptroller rule based on administrative convenience and efficiency); *Graves v. Morales*, 923 S.W.2d 754, 757 (Tex. App.—Austin 1996, writ denied) (same).

TGS contends alternatively that the Comptroller should have used the location where the geophysical data was shot because that would be a better indicator of location of use within the meaning of the tax code and TGS could more easily identify that location from its records. TGS argues that use of the location where the geophysical data was shot would have apportioned fewer receipts to Texas, thereby resulting in lower franchise taxes for TGS. That the Comptroller could have used another means to determine location of use within the meaning of the tax code does not make the method chosen by the Comptroller unreasonable. *See Railroad Comm'n v. Mackhank Petroleum Co.*, 190 S.W.2d 802, 804 (Tex. 1945) ("This Court cannot strike down an administrative order on the ground that . . . a more equitable one could be entered."); *Railroad Comm'n v. Humble Oil & Refining Co.*, 193 S.W.2d 824, 833 (Tex. Civ. App.—Austin 1946, writ ref'd n.r.e.) (agency has discretion when choosing method to carry out legislative mandate). The Texas Supreme Court has long recognized that administrative agencies are created to centralize expertise in certain regulatory areas and, thus, courts should give agencies "a large degree of latitude . . . in the methods by which [an agency] accomplishes its regulatory function." *Corpus Christi v. Public Util. Comm'n*, 572 S.W.2d 290, 297 (Tex. 1978) (citing *Railroad Comm'n v. Houston Natural Gas Corp.*, 289 S.W.2d 559 (Tex. 1956)). The legislature has charged the Comptroller to collect the taxes imposed by the tax code. *See* Tex. Tax Code Ann. §§ 111.001 (comptroller shall collect taxes), 171.154 (franchise taxes shall be paid to comptroller) (West 2008). TGS provided no evidence

regarding its proposed method of determining location of use. On this record, we cannot fault the Comptroller for using the shipping or billing addresses of TGS's customers to determine location of use. We overrule TGS's third issue.[8]

***Penalties and Interest***

On cross-appeal, the Comptroller challenges the district court's judgment finding that the Comptroller abused her discretion in refusing to waive penalties for the second audit period and interest for both audit periods. We review the Comptroller's decision to waive penalties or interest for an abuse of discretion. *See Upjohn Co. v. Rylander*, 38 S.W.3d 600, 611 (Tex. App.—Austin 2000, pet. denied). On the facts of this case, we agree with the district court that the Comptroller abused her discretion in refusing to waive penalties for the second audit period and penalties and interest for both audit periods.

The Comptroller's authority to waive penalties or interest is governed by section 111.103 of the tax code and section 3.5 of the Comptroller's rules. *See* Tex. Tax Code Ann.

---

[8] We likewise reject TGS's argument that it "is not in a position to know" where its customers use the geophysical data TGS provides. The tax code requires TGS to keep adequate records of where geophysical data is used when material to taxation. *See* Tex. Tax Code Ann. § 171.211 (West 2008) (allowing comptroller to examine records to determine franchise tax liability); *see also id.* § 111.0041 (West 2008) (requiring records to be kept open for inspection for four years); *Monaghan v. Seismograph Serv. Corp.*, 108 So.2d 721, 724, 728-28 (Miss. 1959) (holding that company's failure to maintain records cannot justify claim of unfair apportionment). Were we to adopt TGS's argument, we would "render meaningless the regulatory scheme requiring a taxpayer to keep and produce records." *See State v. Glass*, 723 S.W.2d 325, 328 (Tex. App.—Austin 1987, writ ref'd n.r.e.).

§ 111.103 (West 2008); 34 Tex. Admin. Code § 3.5.[9] Section 111.103 allows the Comptroller to settle claims for penalties or interest if the taxpayer exercised reasonable diligence to comply with the provisions of the tax code. Tex. Tax Code Ann. § 111.103. Rule 3.5 of the Comptroller's rules specifies the procedures for requesting a waiver of penalties or interest as well as the factors to be considered by the Comptroller when determining whether to grant a waiver request. *See* 34 Tex. Admin. Code § 3.5. Since its adoption in 1992, Rule 3.5 has specified different procedures for requesting a waiver of penalties or interest (and different factors to be considered) depending on whether the request for waiver was made in connection with an audit or not. *See* 17 Tex. Reg. 98 (1992), *adopted* 17 Tex. Reg. 1546 (1992) (codified at 34 Tex. Admin. Code § 3.5). With regard to a waiver request on an audit liability, the rule in effect at the time of TGS's audit provided that "penalty or interest . . . may be waived if the taxpayer exercised reasonable diligence to comply with the tax laws of this state." *See* 34 Tex. Admin. Code § 3.5(a)(1). Subsection (a)(2) of Rule 3.5 delegates the initial authority to waive penalty and interest to the audit manager, but subsection (a)(4) allows a taxpayer to raise the issue as a contested case matter in a refund or redetermination hearing. *Id.* § 3.5(a)(2), (4). When reviewing a penalty waiver request, Rule 3.5 requires the Comptroller to consider nine factors:

- the taxpayer's audit history;

- the tax issues involved;

---

[9] Because the procedures for requesting a waiver in connection with an audit liability and the factors to be considered by the Comptroller in determining whether to grant a waiver request have not changed since Rule 3.5 was adopted in 1992, we cite to the current rule unless otherwise noted.

- a change in comptroller policy during the audit period;

- size and sophistication of the taxpayer;

- whether tax was collected but not remitted;

- whether returns were timely filed;

- completeness of records;

- delinquencies in other taxes;

- reliance on advice provided by the comptroller's office which caused imposition of penalty and interest.

*Id.* § 3.5(c)(1)-(9). When reviewing an interest waiver request, Rule 3.5 requires the Comptroller to consider three factors:

- undue delay caused by comptroller personnel;

- reliance on advice provided by the comptroller's office which caused imposition of penalty and interest; and

- natural disasters.

*Id.* § 3.5(d)(1)-(3).

In her brief on appeal, as well as her motion for summary judgment in the trial court, the Comptroller incorrectly asserts that she was required to consider the six non-audit factors in Rule 3.5(b) instead of the nine audit factors in Rule 3.5(c) when deciding whether to waive TGS's

22

penalties.[10] The Comptroller does not even reference the three factors in Rule 3.5(d) regarding interest waivers. An agency's decision is arbitrary or results from an abuse of discretion if the agency fails to consider relevant factors, considers an irrelevant factor, or weighs only relevant factors but still reaches a completely unreasonable result. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *Gerst v. Nixon*, 411 S.W.2d 350, 360 n. 8 (Tex. 1966). In considering whether an agency has abused its discretion, a reviewing court must ascertain those factors considered by the agency. *See Gerst*, 411 S.W.2d at 360 n.8; *Consumers Water, Inc. v. Public Util. Comm'n*, 774 S.W.2d 719, 721 (Tex. App.—Austin 1989, no writ).

As evidence that she acted within her discretion to waive only the penalty for the first audit period, the Comptroller submitted the affidavit of Patrick Ramirez. Although Ramirez avers that he has knowledge of the factors in Rule 3.5 to be considered when deciding whether to grant or

---

[10] The six non-audit factors include:

- whether the taxpayer is current in the filing of all returns;

- whether the taxpayer is current in the payment of all taxes and fees due the state;

- whether penalty has been waived on other occasions;

- why penalty was previously waived or denied;

- whether the taxpayer has a good record of timely filing and paying past returns; and

- whether the taxpayer has taken the necessary steps to correct the problem for future filings.

34 Tex. Admin. Code § 3.5(b) (2008).

deny a waiver request, his affidavit does not state which factors were considered or applied by the Comptroller in this case. Likewise, the Comptroller's worksheets, submitted as attachments to Ramirez's affidavit, do not state which factors were considered by the Comptroller in determining whether to grant TGS's waiver requests. With regard to the Rule 3.5 factors to be considered, the worksheets reflect that TGS had no prior history of audit errors; TGS's returns were timely filed;[11] TGS's records were complete; and there were no delinquencies in other taxes. There is also an unexplained discrepancy between the two penalty worksheets because the worksheet for the first audit period states that TGS has an internal tax/accounting department, but the worksheet for the second audit period states that TGS has used a contract accountant for the past fifteen years, which would have included both audit periods. Further, there is no indication on these worksheets that the Comptroller considered whether TGS relied on advice from the Comptroller's office, which caused the imposition of penalties or interest, or whether there was undue delay caused by Comptroller personnel.

The record reflects and the parties agreed that TGS had consistently relied on letter rulings from the Comptroller's office to apportion TGS's licensing receipts. The penalty worksheet for the first audit period states that TGS used the wrong apportionment because "the taxpayer was not aware of the change [in law]." The penalty worksheet for the second audit period reflects that penalties and interest were imposed for the same errors as in the first audit period—namely TGS's use of the wrong apportionment method. Although the Comptroller issued a letter ruling

---

[11] The worksheet for the second audit period reflects that the 2001 return was untimely and that there was one late payment.

to TGS in 2002 explaining the 1997 amendments and the resulting change in the apportionment method for TGS's licensing receipts, this letter was the only evidence of when TGS became aware of the change in law.

While we may presume that TGS, as a taxpayer was aware of the tax code, including relevant changes in the tax law, *see Shivers v. Texaco Exploration & Prod.*, 965 S.W.2d 727, 735 n.4 (Tex. App.—Texarkana 1998) (citing *Mexia Indep. Sch. Dist. v. City of Mexia*, 133 S.W.2d 118, 121 (Tex. 1939) (finding that taxpayer was charged with knowledge of the law)), an agency is bound to follow its own rules and procedures. *See Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 255 (Tex. 1999); *Public Util. Comm'n v. Gulf States Util. Co.*, 809 S.W.2d 201, 207 (Tex. 1991). An agency abuses its discretion if it acts without reference to guiding rules or principles. *See City of Amarillo v. Railroad Comm'n*, 894 S.W.2d 491, 495 (Tex. App.—Austin 1995, writ denied). Because we cannot ascertain whether the Comptroller considered the relevant audit factors in Rule 3.5(c) and (d)—and the Comptroller's briefing to this Court (and the district court) states that she incorrectly considered the non-audit factors, instead of the audit factors—when deciding whether to waive penalties and interest, we find no error in the trial court's determination that the Comptroller abused her discretion in denying TGS's requests. *See Gerst*, 411 S.W.2d at 360 n.8; *Consumers Water, Inc.*, 774 S.W.2d at 721. We overrule the Comptroller's issue on cross-appeal.

**CONCLUSION**

Having overruled the parties' issues, we affirm the trial court's judgment.

25

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed:   August 15, 2008